IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



LINDA HUDSON,

        Plaintiff,

v.

ADAMS STREET PARTNERS, an
Illinois Corporation, T.
BONDURANT FRENCH, DENNIS P.
McCRARY, KATHERINE E. WANNER,
and JOAN NEWMAN,

        Defendants.

FILED
AUG 1 1 2005
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

Case No. 04 C 1853

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Hudson (hereinafter, "Plaintiff") filed a multi-count complaint against Defendants Adams Street Partners, LLC and several named employees of Adams Street Partners (hereinafter, collectively, "ASP") alleging employment discrimination under 42 U.S.C. § 1981 and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Before the Court is Defendants' Motion for Summary Judgment. For the following reasons, the motion is **granted** in its entirety.

### I. BACKGROUND

Plaintiff Linda Hudson, an African American, began working as an Executive Assistant (an "EA") for UBS Brinson in November 1999, at a base salary of $39,000 per year. On January 1, 2001, part of UBS Brinson spun off to form ASP. At that time, ASP hired Plaintiff in the same capacity at a base salary of $41,000 per year, a $2,000

increase from her previous year's salary. In addition, Plaintiff received a $10,000 bonus for work performed in 2000 and was offered 920 ASP ownership units, which she purchased. Throughout her tenure at ASP, Plaintiff supported ASP's Partnership Team and was an at-will employee.

ASP has conducted annual employee performance reviews since its inception in 2001. It also started conducting less comprehensive mid-year evaluations in 2002. Accordingly, the record contains Plaintiff's annual reviews for the years 2001, 2002, and 2003, her mid-year reviews for 2002 and 2003, and memoranda pertaining to her 2002 and 2003 mid-year reviews. Each of these five reviews was conducted by one or more members of ASP's Partnership Team who functioned as Plaintiff's direct supervisor.

ASP's performance rating guide grades each employee on a 1 to 5 scale: "1" "Unsatisfactory Performance," "2" "Needs Improvement," "3" "Meets Expectations," "4" "Exceeds Expectations," and "5" "Outstanding Performance." In addition to providing an overall assessment, the reviewing manager evaluates the employee in a number of specific work areas, such as "Client Focus and Management," "Initiative," "Teamwork," "Communication and Interpersonal Skills," "Decision Making/Judgment," and "Product/Technical Knowledge." For each area, the manager must provide detailed comments as well as a numerical rating. Furthermore, employees may evaluate their own job performance by submitting an annual self-assessment.

Sometime in late 2001 or early 2002, Marc E. Sacks, the then-head of ASP's Partnership Team, conducted Plaintiff's 2001 annual review. Sacks assigned Plaintiff ratings of "3" or "3+" in each work area and an overall rating of "3," indicating that she had met ASP's expectations. Sacks specifically noted that Plaintiff "improved her performance with the partnership team in 2001. Her attitude and esprit-de-corps was more positive, and she worked to find ways to improve work efficiency of partnership team members." (Def. at 553).

The record indicates that Plaintiff's relationship with Defendants began to deteriorate over the course of 2002 and into 2003. In late March 2002, ASP permanently hired Cathy Wright, a Caucasian, as an EA at a base salary of $65,000 per year. Plaintiff learned of Wright's base salary shortly after Wright was terminated for deficient performance in October 2002.

Dismayed by the disparity between her base salary and Wright's, Plaintiff complained to Defendant Joan W. Newman, ASP's Human Resources partner, and Defendant T. Bondurant French, ASP's Chief Executive Officer. CEO French told Plaintiff that Wright's base salary was "out of line with [ASP's] compensation philosophy" in that, relative to comparables outside ASP, the company preferred to compensate its employees with lower base salaries and higher bonuses coupled with ownership units to foster teamwork, thereby sustaining long-standing client relationships. (French Dep. at 23-24). French also mentioned that, after accepting a base salary of $55,000 per year, Wright used a competing offer for $64,000 per year to negotiate

her unusually high base salary. Moreover, at his deposition, French stated that, to offset Wright's higher base salary, her bonus was reduced to a range between $5,000 and $10,000, and she was not offered ASP ownership units.

On November 1, 2002, Plaintiff met with Defendant Katherine E. Wanner, a partner on ASP's Partnership Team who directly supervised Plaintiff, to discuss her 2002 mid-year performance review. Wanner's review rated Plaintiff a "3" in five categories and a "3+" in Job and Product Knowledge, identifying the following as the "key takeaways" for Plaintiff: "Continue to meet 2002 objectives with a *positive, collegial and collaborative attitude*. Be proactive in determining ways to contribute to the partnership team. Demonstrate initiative in sharing expertise . . . with team . . . as well as openness to exposure to new situations and responsibilities." (Def. at 538 (emphasis in original)). Although the parties contest the precise events that transpired at this meeting, it is undisputed that Plaintiff disagreed with Wanner's assessment of Plaintiff's 2002 performance. Follow-up meetings held on November 7 and November 8, 2002, failed to resolve the matter -- so much so that Plaintiff refused to sign the mid-year evaluation prepared by Wanner.

On her December 4, 2002 self-assessment form, Plaintiff assigned herself ratings of "4" in all categories. At her 2002 annual review conducted in February 2003, Plaintiff received an overall performance rating of "3." For work performed in 2002, Plaintiff earned $72,872

in total compensation, which included a $17,000 bonus and $14,250 from her ownership units.

On September 9, 2003, Wanner and Defendant Dennis P. McCrary, head of ASP's U.S. Partnership Team, met with Plaintiff to discuss her 2003 mid-year review, which rated her "2" in half of the performance categories and "1" as to her communication and interpersonal skills. At this meeting, McCrary became frustrated by Plaintiff's alleged refusal to participate in the conversation and asked her, "Do you think this [her performance evaluation] is bullshit?" (McCrary Dep. at 53-54; Wanner Dep. at 59-60). On September 15, 2003, Wanner and McCrary sent a memorandum to Human Resources Partner Newman recounting their September 9 meeting with Plaintiff. This memorandum noted that Plaintiff had been placed on a 60-day measured performance plan and that, absent "significant improvement," she would be terminated. (Def. at 572).

On October 21, 2003, Plaintiff addressed a memorandum to Wanner and McCrary, and copied to French and Newman, articulating her disagreement with the substance of her 2003 mid-year review. On November 10, 2003, Supervisors McCrary and Wanner sent a memorandum to CEO French and Human Resources Partner Newman responding to Plaintiff's October 21, 2003 communication. Highlighting Plaintiff's unsatisfactory contributions to the Partnership Team, the memorandum closed by stating that "[a]ll members of our group have lost confidence in [Plaintiff's] ability and desire to improve. Consequently we will be terminating her as of _____." (*Id.* at 561).

CEO French convinced his colleagues to give Plaintiff until the end of March 2004 to show improvement.

On December 1, 2003, Plaintiff submitted her 2003 self-assessment form, again giving herself across-the-board ratings of "4." When supervisors Wanner and McCrary conducted Plaintiff's year-end 2003 review in February 2004, however, they accorded her an overall rating of "2." The assessment noted that Plaintiff "will be on measured performance through the First Quarter of 2004, during which time significant and lasting improvement . . . will be required in order for her to remain an employee with Adams Street." (*Id.* at 517). Plaintiff states that she received a bonus of $5,000 for work performed in 2003. On February 13, 2004, McCrary and Jim Korczak met with Plaintiff to discuss her 2003 year-end performance review, which she once again refused to sign.

On March 10, 2004, after a colleague informed Plaintiff that ASP intended to terminate her on March 12, Plaintiff filed her original complaint in this Court alleging racial discrimination under 42 U.S.C. § 1981 and intentional infliction of emotional distress ("IIED"). After placing Plaintiff on a paid leave of absence and giving her the option to resign, ASP terminated Plaintiff's employment effective April 23, 2004.

On May 13, 2004, Plaintiff filed an EEOC charge, and on June 7, 2004 the EEOC issued a Notice of Right to Sue letter. On April 8, 2004, the Court dismissed Plaintiff's IIED claim. On July 18, 2004, Plaintiff filed her first amended complaint against Defendants

incorporating her EEOC charge and alleging racial discrimination, retaliation, and abridgment of the right to contract.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 624 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

Plaintiff's three-count complaint claims that Defendants (1) discriminated against her based on race in violation of Title VII; (2) abridged her right to make and enforce contracts pursuant to § 1981 by racially discriminating against her; and (3) retaliated against her in violation of Title VII when they terminated her shortly after she filed her original complaint in this matter. Defendants move for summary judgment on the ground that Plaintiff has failed to produce facts sufficient to establish the prima facie case for each count.

### A. Racial Discrimination

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or

- 7 -

privileges of employment, because of such individual's race . . . "
§ 2000e-2(a)(1). Plaintiff concedes that she has no direct evidence that Defendants discriminated against her because of her race. To survive summary judgment under the circumstantial evidence test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), Plaintiff must establish that: "(1) she [is] a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was meeting [ASP's] legitimate expectations; and (4) other similarly-situated employees who were not members of [her] protected class were treated more favorably." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002)(citing *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000)).

As an African-American, Plaintiff is a member of a protected class, and her termination constitutes an adverse employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)(defining an adverse employment action). Nonetheless, Plaintiff is unable to establish the final two elements of the prima facie case: that she was meeting ASP's legitimate expectations and that other similarly-situated white employees were treated more favorably.

### 1. Meeting ASP's Legitimate Expectations

Plaintiff's opposition brief analyzes only one prong of the circumstantial evidence method -- that similarly-situated white employees were treated more favorably -- before jumping to the issue of pretext. The Seventh Circuit repeatedly has "'warned litigants

- 8 -

that the prima facie case must be established and not merely incanted.'" *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004)(quoting *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002)). This case appears to be yet another example of a plaintiff putting "'the pretext cart before the prima facie horse.'" *Id.* (quoting *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 744 (7th Cir. 2002)). Despite this oversight, it is clear from Plaintiff's submissions that she has failed to produce evidence sufficient to carry her burden on this element of the prima facie case.

The record establishes that Defendants began to view Plaintiff's job performance as unsatisfactory by mid-2003. Plaintiff's 2003 mid-year evaluation specifically graded Plaintiff's "Communication and Interpersonal Skills" a "1" and noted that "[s]he generally has had a negative attitude and team members find her difficult to approach as she acts put off by being assigned work." (Def. at 521-22). The review also criticized Plaintiff for lacking initiative and failing to take ownership of her tasks. (*Id.* at 519). Plaintiff's 2003 year-end review reiterated these critiques and informed her that she would be on measured performance for the first quarter of 2004.

In the face of this substantial evidence that she was not meeting ASP's legitimate expectations, Plaintiff must specifically refute her supervisors' explanation of her deficient job performance. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994)(stating that "a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's

claim of performance deficiencies"). Plaintiff's October 2003 rebuttal letter to her 2003 mid-year review constitutes her most detailed refutation of ASP's appraisal of her job performance. Plaintiff wrote that "[i]t is very clear to me that the review has nothing to do with performance and everything to do with personality." (Def. at 562). To support this contention, Plaintiff highlighted several projects that she carried out prior to her mid-year review.

Nevertheless, Plaintiff's rebuttal letter fails to refute ASP's assessment of her performance. Plaintiff's claim that she was being assessed based on "personality" does not contest Defendants' negative assessment of her attitude -- it confirms it. Moreover, Plaintiff's litany of the various projects on which she worked prior to her mid-year review does not refute Defendants' quite different claim that she lacked initiative and failed to take ownership of the projects she was assigned.

Finally, Plaintiff's deposition and declaration are inadequate to avoid summary judgment because a Title VII plaintiff may not rely on general averments of adequate performance to survive summary judgment. *See Dale v. Chi. Trib. Co.*, 797 F.2d 458, 464 (7th Cir. 1986)(affirming summary judgment for defendant employer because plaintiff's only evidence that he had met his employer's legitimate expectations was his own deposition). "'An employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability.'" *Williams v.*

*Seniff*, 342 F.3d 774, 789 (7th Cir. 2003)(quoting *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)). Notably, the record contains no statements from third parties (such as supervisors or coworkers) substantiating Plaintiff's assertion that she was performing her job satisfactorily. Accordingly, Plaintiff has not established the third element of her prima facie racial discrimination case.

### 2. *Similarly-Situated Employees Treated More Favorably*

Plaintiff also has not established the fourth element of the *McDonnell Douglas* test. "To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects. . . ." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). In the instant case, Plaintiff testified that she was treated differently from her fellow EAs on a number of occasions. The Court addresses several of these allegations in turn, concluding that in each instance Plaintiff failed to satisfy her burden.

#### a. *Wright Base Salary Dispute*

Plaintiff points to the $20,000 disparity between former EA Cathy Wright's base salary and her own as evidence of employment discrimination. It is undisputed that both Wright and Plaintiff supported the Partnership Team and were paid substantially different base salaries. However, Plaintiff ignores the fact that ASP's compensation system had three components: base salary, performance

bonuses, and profits from ownership units. Plaintiff presents no evidence challenging Defendants' testimony that Wright's comparatively higher base salary was offset by her reduced bonus range and lack of ownership units. Likewise, Plaintiff concedes that she has no evidence to refute CEO French's testimony that Plaintiff's total compensation was in the middle of ASP's range for EAs. (Pl. 56.1 Resp. ¶ 44). In light of the unrebutted evidence that Plaintiff's total compensation was at or near the median, no discriminatory intent can be inferred from the fact that ASP paid Wright $20,000 more in a base salary.

Plaintiff also overlooks the significance of Wright's aggressive bargaining for a $65,000 base salary. The fact that Wright used a competitive offer from another employer to negotiate a higher base salary undercuts Plaintiff's argument that Wright is an apt comparable. See Chang v. Univ. of R.I., 606 F. Supp. 1161, 1243 (D.R.I. 1985)(noting that "upgrading an individual's pay to match or forestall an outside offer can comprise a valid defense under . . . the Equal Pay Act"). Plaintiff and Wright therefore were not similarly-situated in all respects.

Finally, Plaintiff ignores the fact that Defendants terminated Wright for the same reason -- deficient performance -- that they discharged Plaintiff. Rather than demonstrating Defendants' disparate treatment of Plaintiff on account of her race, ASP's dealings with Wright as reflected in the record indicate that she and Plaintiff were treated similarly. See Johnson v. Cambridge Indus.,

*Inc.*, 325 F.3d 892, 899 (7th Cir. 2003)(holding that similar treatment of plaintiff and white co-worker undermined plaintiff's racial discrimination claim). Consequently, Plaintiff's reliance on the disparity between her base salary and Wright's fails to establish that a white employee was treated more favorably.

### b. Supervisor McCrary's Use of Profanity

Plaintiff claims that she is the only employee at whom Defendant McCrary directed profanity. The incident in question occurred during Plaintiff's 2003 mid-year review when, frustrated by Plaintiff's alleged unwillingness to engage in meaningful dialogue about her purported performance deficiencies, McCrary asked her if she thought the substance of his and Wanner's review was "bullshit." However, Plaintiff presents no evidence to support her contention that she was the only employee at whom McCrary swore. In fact, Plaintiff vitiates her own argument when in her brief she notes that McCrary treated the white EAs harshly as well. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 347 (7th Cir. 1999)(affirming summary judgment for defendant employer in discrimination action because abusive supervisor treated all employees in a rude and offensive manner). Given Plaintiff's own testimony and assertions, it would not be rational for a trier of fact to conclude that McCrary treated Plaintiff less congenially than he did her white coworkers.

### c. Monitoring of Plaintiff's E-mails

Plaintiff claims that she was the only employee whose e-mail ASP "monitored" and that this disparate treatment was based on race.

Nevertheless, the record -- including Plaintiff's own testimony -- reveals that Plaintiff's characterization of this matter is both misleading and fails to support her discrimination action. ASP did not "monitor" Plaintiff's e-mail; rather, when several of fellow EAs complained about the offensive content of e-mails Plaintiff had sent to them, ASP investigated the matter by reviewing several months' worth of her e-mails. Aside from revealing that Plaintiff in fact had circulated derogatory e-mails, this investigation does not bolster Plaintiff's discrimination claim because the record contains no evidence that white employees who engaged in similar misconduct were treated differently. Thus, there is no genuine issue as to whether ASP treated the e-mail accounts of white employees more favorably.

### d. Redemption of Plaintiff's Ownership Units

Plaintiff makes a conclusory assertion that white employees were allowed to keep their partnership units when they left ASP. Human Resources Partner Newman testified in her deposition that ASP redeems the equity units of all employees when their employment is terminated. Given that Plaintiff concedes she has no evidence to counter Newman's testimony, her bald assertion to the contrary fails to proffer evidence sufficient to create a triable issue of fact.

### e. Other Incidents

In her various submissions, Plaintiff mentions several other incidents of alleged discrimination. Some of these incidents are untimely while others lack sufficient factual support.

## B. Abridgment of Right to Contract

Plaintiff also contends that Defendants' actions violated § 1981, which "prohibits discrimination on grounds of race in the making and enforcing of contracts." *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999); *see also* § 1981(a)("All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.") "'The same standards governing liability under Title VII apply to § 1981 claims.'" *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) (quoting *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998)). Because Plaintiff has not established the prima facie elements of her Title VII racial discrimination action, her § 1981 claim fails as well.

## C. Retaliation

There are two ways for a plaintiff to establish a prima facie case of retaliation: the direct evidence or the circumstantial evidence method. *Stone v. Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Because Plaintiff neglects to identify under which method she is proceeding, the Court discusses each in turn.

### 1. Direct Method

The first method of establishing a prima facie case of retaliation is for the plaintiff to present direct evidence of: (1) a statutorily protected activity; (2) an adverse employment action;

and (3) a causal connection between the two. *Id.* If the defendant contradicts the direct evidence presented by the plaintiff, "the case must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, 'in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm.'" *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (quoting *Stone*, 281 F.3d at 642).

Plaintiff clearly engaged in a statutorily-protected activity when she filed her Title VII complaint against ASP. Even assuming that Plaintiff has satisfied the direct method's causation requirement, she has failed to rebut Defendants' evidence that it would have taken the adverse employment action against her regardless. Plaintiff readily concedes that, before she filed her original complaint on March 10, 2004, a fellow EA alerted her that ASP intended to fire her on March 12, 2004. This concession alone establishes that Defendants' purported retaliatory motive was not the but-for cause of Plaintiff's termination. Moreover, in multiple performance reviews Defendants indicated that Plaintiff was in jeopardy of being discharged for poor performance, which further substantiates that Plaintiff's filing of her lawsuit was not the but-for cause of her termination.

### 2. Indirect Method

The second method of establishing a prima facie case of retaliation is adapted from the *McDonnell Douglas* circumstantial

evidence test. *Stone*, 281 F.3d at 644. Under this approach, the plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated employees who did not engage in statutorily protected activity. *Id.* The second element of the *McDonnell Douglas* analysis for retaliation is identical to the third element of the circumstantial evidence test for racial discrimination. Having determined above that Plaintiff failed to meet her burden on this element as to her discrimination action, the Court must conclude that Plaintiff's retaliation claim fails as well.

### III. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED** on all counts.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　United States District Court

Dated: August 11, 2005